JUDGE CASTEL



13 CIV 8739

DENNIS P. ORR
DOrr@mofo.com
GRANT J. ESPOSITO
GEsposito@mofo.com
MORRISON & FOERSTER LLP
1290 Avenue of the Americas
New York, NY  10104-0050
212.468.8000
Attorneys for Plaintiff
Reed Elsevier Inc.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x
REED ELSEVIER INC.,                                :    No. _____
                                                   :
                                                   :
                          Plaintiff,               :    **COMPLAINT**
                                                   :
           v.                                      :
                                                   :
TRANSUNION HOLDING COMPANY, INC.,                  :
                                                   :
                          Defendant.               :
------------------------------------------------------------x

Plaintiff REED ELSEVIER INC. ("Reed Elsevier") brings this action for injunctive relief against Defendant TRANSUNION HOLDING COMPANY, INC. ("TransUnion"), by and through its undersigned attorneys, and alleges on knowledge with respect to its own acts, and on information and belief with respect to all other matters as follows:

### INTRODUCTION

1.  Plaintiff Reed Elsevier has brought this action due to the breach by Defendant TransUnion of a "no-hire" agreement entered into by TransUnion and Reed Elsevier in December 2012. In that agreement, Reed Elsevier agreed to waive enforceable restrictive

ny-1121099

covenants in the employment agreement of James Peck ("Peck"), then the Chief Executive Officer ("CEO") of Reed Elsevier's LexisNexis Risk Solutions division ("RE LNRS"), to allow him to assume the CEO position of TransUnion, a RE LNRS competitor. In exchange for Reed Elsevier's waiver of Peck's non-competition covenant, Peck and TransUnion made an unequivocal and binding contractual commitment not to hire certain high-level RE LNRS employees through December 31, 2014. Now, just one year after making that commitment to Reed Elsevier, TransUnion is attempting to breach its clear and unambiguous obligations by hiring Armando Escalante ("Escalante"), RE LNRS's former Chief Technology Officer ("CTO"), who is one of the executives TransUnion agreed not to hire until after December 31, 2014. In this action, Reed Elsevier seeks injunctive relief to prevent the irreparable injury the hiring of Escalante by TransUnion will cause to Reed Elsevier.

2.      In order to take the TransUnion CEO position last year, Peck sought a waiver from Reed Elsevier of the non-competition covenant of his employment agreement. After careful consideration of Peck's waiver request and negotiations with TransUnion and Peck, Reed Elsevier, on its behalf and on behalf of each of its subsidiaries and affiliates, agreed to waive Peck's non-competition covenant to allow him to become the CEO of TransUnion. In exchange for this waiver, both TransUnion and Peck independently agreed to, among other things, a narrow and well-defined employee "no-hire" clause, which was memorialized by each in stand-alone agreements executed on December 6, 2012. Those no-hire clauses provide that through December 31, 2014, TransUnion and Peck will not hire any individual who was on the RE LNRS "senior management team" (i.e., those individuals who reported directly to Peck and those who reported to Peck's direct reports) at any time during calendar year 2012 without the prior written consent of Reed Elsevier.

3. This case now arises from TransUnion's solicitation of and stated intention to hire Escalante without first obtaining Reed Elsevier's consent as it is contractually obligated to do. Escalante was the CTO of RE LNRS from January 2005 to April 2012 and is currently employed at TLO, LLC ("TLO") as its Chief Operating Officer. Escalante was on the RE LNRS "senior management team" as defined in and as covered by the December 6, 2012 Agreements.

4. Notably, this is not TransUnion's first attempt to employ Escalante's services. In early 2013, Peck made an inquiry as to whether Reed Elsevier would be willing to waive the no-hire restriction to allow TransUnion to employ Escalante as a consultant. Reed Elsevier refused to waive the no-hire restriction in light of Escalante's extensive knowledge of RE LNRS's technology and confidential information and the risks Reed Elsevier would face if Escalante were to join Peck at TransUnion. Reed Elsevier's position has not changed since that prior request. Accordingly, TransUnion's hiring of Escalante would be in direct violation of the clear no-hire provisions of its December 6, 2012 Agreement.

5. TransUnion attempts to justify its breach of contract by arguing that a certain Asset Purchase Agreement, dated as of October 31, 2013 (the "APA"), through which TransUnion will acquire out of bankruptcy substantially all of the assets of TLO (currently a debtor-in-possession in a Chapter 11 case pending in the Bankruptcy Court for the Southern District of Florida), makes the no-hire covenant inapplicable with respect to Escalante. Pursuant to the APA, and without first obtaining Reed Elsevier's consent as it was contractually obligated to do, TransUnion agreed to assume and acquire Escalante's employment agreement with TLO and has offered to or will offer to hire, among others, Escalante.

6. TLO is a significant competitor of RE LNRS, headquartered in Boca Raton, Florida. RE LNRS competes with TLO in the provision of information in the online, batch and xml investigative risk solutions sectors targeting both business and government accounts. TLO

and RE LNRS directly compete in collections, law enforcement, financial services, fraud prevention, private investigations, and government services markets, among others.

7. The hiring of Escalante will violate the clear terms of the December 6, 2012 Agreements and inflict irreparable harm on Reed Elsevier. During his time at RE LNRS, Escalante was responsible for driving RE LNRS's technology development, research, information systems, and security, and for executing RE LNRS's technology strategy. Escalante helped develop a high performance computing cluster platform ("HPCC") to manage and process what is commonly referred to as "big data." HPCC quickly formed the backbone of RE LNRS's business, and has become a distinguishing feature of RE LNRS's business. In fact, the reason for Peck's waiver request earlier this year, was to seek Escalante's assistance in connection with TransUnion's potential license of the HPCC platform. Great and irreparable damage would result to Reed Elsevier should that proprietary knowledge and technology fall into the hands of a competitor such as TransUnion.

8. For these reasons and the reasons set forth more fully below, Reed Elsevier brings this action for preliminary and permanent injunctive relief to require TransUnion to abide by its clear obligations and prevent the hiring and/or employment of Escalante by TransUnion through December 31, 2014.

## THE PARTIES

9. Plaintiff Reed Elsevier is a Massachusetts corporation having its principal place of business at 125 Park Avenue, Suite 2300, New York, New York 10017. Reed Elsevier's RE LNRS division is a leading provider of essential information to assist its global customers assess, predict, and manage risk.

10. Upon information and belief, Defendant TransUnion is and was at all material times a Delaware corporation having its principal place of business at 555 West Adams Street,

Chicago, Illinois 60661. Like RE LNRS, TransUnion provides data solutions and analytics to help its customers worldwide improve decision-making and optimize processes.

11.     Upon information and belief, TransUnion is involved in continuous substantial activities in the state of New York, and has offices and/or agents in the state of New York. Using its extensive interactive online services, TransUnion transacts significant business in the state of New York and has defended itself in lawsuits in this state. TransUnion negotiated and entered into a contract with Plaintiff, whose principal place of business is in New York.

## JURISDICTION AND VENUE

12.     Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1332, because the parties are of diverse citizenship and the amount in controversy exceeds the sum of $75,000, exclusive of costs and interest.

13.     This Court has personal jurisdiction over TransUnion under the New York Long-Arm Statute, N.Y. C.P.L.R. § 301, et seq. Upon information and belief, TransUnion regularly conducts business in the State of New York and has offices, agents or agency in the state of New York. Additionally, TransUnion and Peck negotiated and entered into the contracts at issue with Plaintiff whose principal place of business in New York. Plaintiff signed the contracts at issue in New York and harm resulting from the breach of those contracts will be suffered in New York by the Plaintiff.

14.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(a), (b), and (d) because TransUnion is subject to personal jurisdiction in this district.

ny-1121099

# FACTS

A. **James Peck's Employment with Reed Elsevier, His Departure to TransUnion, and the No-Hire Agreements**

15. On October 31, 2011, Plaintiff and Peck entered into an Employment Agreement (the "Employment Agreement"), confirming the terms and conditions of Peck's employment as the CEO of RE LNRS.

16. As the CEO of RE LNRS, Peck had access to its highly confidential technology, information and trade secrets regarding RE LNRS's long term business plans, strategy, technology roadmap and other sensitive business information. To ensure that this technology and information remained confidential and would not be disclosed to its competitors, Reed Elsevier took great care to draft an Employment Agreement with Peck that contains reasonable and narrowly tailored post-employment restrictive covenants including confidentiality, non-competition and non-solicitation covenants.

17. Commencing in or around the summer of 2012, Peck began discussions with representatives of Plaintiff about his career advancement opportunities within Reed Elsevier. As those discussions continued, Peck also made known to Reed Elsevier that he would consider other employment opportunities if they arose.

18. In or around November 2012, Peck made known to Reed Elsevier that he was interested in accepting a position as the CEO of TransUnion, a competitor of RE LNRS. Peck recognized, however, that his employment by TransUnion was prevented by certain restrictive covenants contained in his Employment Agreement with Plaintiff. Specifically, the Employment Agreement states that:

> During the 12-month period immediately following the last day of your employment by the Company or any of its Affiliates (the "Employment End Date"), you will not, directly or indirectly, on your own behalf or on behalf of or in conjunction with any person or any firm, company, or other entity, perform "Services" (defined below) on behalf of any enterprise (including, without limitation, any corporation, partnership, proprietorship, or other venture) which competes with:

>   (A) any business of any of the LexisNexis Risk Solution Companies (defined below): (1) with which you were actively involved at any time during the 12-month period immediately preceding the Employment End Date, or
>   (2) about which you obtained or knew Confidential Information at any time during the 12-month period immediately preceding the Employment End Date; or
>
>   (B) any business that any of the LexisNexis Risk Solutions Companies can reasonably demonstrate was, as of the Employment End Date, being considered, being researched, or under development by any of the LexisNexis Risk Companies at any time during the 12-month period immediately preceding the Employment End Date (but only if you obtained or knew Confidential Information about any such business at any time during the 12-month period immediately preceding the Employment End Date).

You stipulate that the business of the LexisNexis Risk Solutions Companies is conducted nationwide and worldwide, that the geographic scope of the restrictions set forth in this Section 11 (b)(i) is the geographic territory for which you were responsible during the 12-month period immediately preceding the Employment End Date, and that this geographic scope is both reasonable and necessary to protect one or more of the LexisNexis Risk Companies from unfair competition.

TransUnion is, and at all relevant times has been, a company that competes with RE LNRS, and Peck's accepting employment with TransUnion within twelve months of the end of his employment with Reed Elsevier would have violated the non-competition covenant of the Employment Agreement.

19. Understanding that his employment by TransUnion would violate the non-competition covenant of his Employment Agreement, Peck requested from Reed Elsevier a waiver of the non-competition covenant to enable him to take the position with TransUnion. Reed Elsevier gave careful consideration to his request, focusing in particular on whether his request could be granted while at the same time protecting Reed Elsevier's interests. In this case, while TransUnion was a RE LNRS competitor, the two businesses also had significant supplier and customer relationships. Accordingly, Reed Elsevier was willing to consider an arrangement that would allow Peck to assume a leadership role at TransUnion as long as appropriate

ny-1121099

safeguards were in place to ensure that Reed Elsevier's competitive and commercial interests were secure.

20. Accordingly, the parties engaged in negotiations over the terms upon which Reed Elsevier would agree to allow Peck to join TransUnion. Eventually, a termination agreement was reached and executed by Peck and Reed Elsevier on December 6, 2012, setting out the precise terms on which Peck could join TransUnion (the "Peck Agreement"). Reed Elsevier also insisted that, as a condition to the agreement, TransUnion enter into a separate letter agreement confirming its acknowledgement of Peck's obligations and requiring it to adhere to corresponding obligations (the "TransUnion Agreement"). The TransUnion Agreement was also executed on December 6, 2012 (together the Peck Agreement and TransUnion Agreement are referred to as the "December 6, 2012 Agreements").

21. Under the December 6, 2012 Agreements, Reed Elsevier waived the non-competition restrictions set forth in the Employment Agreement with respect to Peck taking the position with TransUnion. In consideration for that waiver, both Peck and TransUnion agreed to a carefully drafted and narrowly tailored no-hire provision in each of the December 6, 2012 Agreements. Thus, the Peck Agreement states:

> 3. With respect to the non-solicitation restrictions set forth in Section 11 (c)(i) of the Employment Agreement, you hereby agree that in addition to the restrictions contained therein with respect to recruiting, soliciting, or enticing away employees from the Company or any Company Affiliate, you further agree that: (i) through December 31, 2014, you will not, without the prior written consent of Reed Elsevier's Global Human Resources Director, hire any individual who was on the senior management team of LexisNexis Risk Solutions at any time during calendar year 2012 (the "senior management team" means those employees who reported directly to you, or reported to any of your direct reports); and (ii) through December 31, 2013, you will not, without the prior written consent of Reed Elsevier's Global Human Resources Director, hire any individual who was employed by the Company or any Company Affiliate at any time during calendar year 2012. In all other respects Section 11(c)(i) remains unchanged and in full force and effect.

/\*\*\*/

>5. Prior to commencement of your employment by TransUnion, TransUnion must provide Reed Elsevier's Chief Legal Officer with written confirmation (in a form acceptable to Reed Elsevier's Chief Legal Officer) that:
>
>>(a) it is aware of and acknowledges that you are bound by the postemployment restrictions set forth in the Employment Agreement (as modified by this letter) and in this letter and that it will take no action to cause, seek to cause or otherwise entice you to breach any of these restrictions;
>>
>>(b) through December 31, 2013, it will not modify, change, or terminate any agreement that the Company or any of its Affiliates has with TransUnion or any other member of the TransUnion Group without the prior written consent of Reed Elsevier's Chief Legal Officer; and
>>
>>(c) it will abide by the hiring restrictions set forth in paragraph 3 above.

22.  Similarly, the TransUnion Agreement contains an acknowledgment by TransUnion of its knowledge of the Employment Agreement and the Peck Agreement, and sets forth TransUnion's separate contractual non-solicitation and no-hire covenants:

>3. TransUnion agrees to abide by the non-solicitation restrictions set forth in Section 11(c)(i) of the Employment Agreement and in addition further agrees that: (i) through December 31, 2014, TransUnion will not, without the prior written consent of Reed Elsevier's Global Human Resources Director, hire any individual who was on the senior management team of LexisNexis Risk Solutions at any time during calendar year 2012 (the "senior management team" means those employees who reported directly to Mr. Peck, or reported to any of Mr. Peck's direct reports); and (ii) through December 31, 2013, TransUnion will not without the prior written consent of Reed Elsevier's Global Human Resources Director, hire any other individual who is employed by the Company (or any subsidiary or affiliate) at any time during calendar year 2012 provided, however, that with respect to this clause (ii) only the Company agrees not to unreasonably withhold consent and further agrees that in the event TransUnion unknowingly hires such an individual it will have 60 days to cure its breach of this provision by terminating such individual's employment with it or obtaining the required consent.

23.  Reed Elsevier was under no obligation to alter the binding Employment Agreement to facilitate Peck's employment with TransUnion. Reed Elsevier agreed, however, to this limited waiver after a careful and considered analysis, and, importantly, in consideration of

and reliance upon Peck's and TransUnion's separate agreements to be bound by the non-solicitation and no-hire provisions explicitly set forth in the December 6, 2012 Agreements.

24.  The no-hire provisions of both the TransUnion Agreement and the Peck Agreement were carefully and extensively negotiated between the parties to, among other things, ensure that through December 31, 2014 neither TransUnion nor Peck would hire any individual who was on the senior management team of RE LNRS at any time during calendar year 2012, without the written consent of Reed Elsevier. Indeed, the provisions were crafted to ensure that the hiring of former employees of RE LNRS who departed from RE LNRS during calendar year 2012, such as in particular Escalante, was encapsulated within the provisions. In those negotiations, all the parties were represented by legal counsel.

25.  Since the December 6, 2012 Agreements were executed, TransUnion has, consistent with its contractual obligations, requested waivers of the TransUnion Agreement to hire employees from Reed Elsevier. There have been at least seven requests for such waivers since January 2013 (this does not include the request for a waiver regarding Escalante). Reed Elsevier gave careful consideration to each of these requests, and denied none of them (other than the request earlier this year relating to Escalante).

### B.  Armando Escalante's Employment History

26.  Escalante was employed by RE LNRS as the CTO of RE LNRS from January 2005 to April 2012, reporting directly to Peck. As such, Escalante was an individual who was on the senior management team of RE LNRS during the calendar year 2012 as defined in the no-hire provisions of the Peck Agreement and the TransUnion Agreement.

27.  As CTO, Escalante was primarily responsible for RE LNRS's research and development of new technology, information and risk management systems. Escalante was considered to be a member of RE LNRS's senior executive team, which was the "brain trust" of

ny-1121099

RE LNRS's operations, with access to and intimate familiarity of highly sensitive competitive information.

28. During his more than seven years with RE LNRS, Escalante also led the RE LNRS development team that built its HPCC platform. The HPCC system greatly outperforms other competing technology systems, and is used by RE LNRS to run its multibillion dollar platform. Since 2011, HPCC is responsible for over 90% of RE LNRS's revenue. Escalante has intimate knowledge of the proprietary technology that went into the development and operation of HPCC, including the source code of highly confidential and proprietary add-ons to the HPCC platform. As a technology and data company, such proprietary technology is Reed Elsevier's most valuable asset and the backbone to its business success.

29. As set forth above, TransUnion previously attempted to hire Escalante. In early 2013, Peck, in accordance with his obligations under the no-hire provisions of the Peck and TransUnion Agreements, requested that TransUnion be allowed to hire Escalante as a consultant. Peck was interested in working with Escalante to convince TransUnion that it should adopt HPCC technology. He indicated that the HPCC system had the potential to transform TransUnion's business. However, he required Escalante's assistance to convince TransUnion to make this significant change.

30. Reed Elsevier considered the waiver request, and decided that it would not grant it. Reed Elsevier was concerned about the possibility of two top-level managers (Peck and Escalante), with intimate knowledge of RE LNRS strategy, products, go-to-market methodologies, technology and proprietary algorithms, uniting at TransUnion, recreating RE LNRS's world-class technology infrastructure, poaching further talent from RE LNRS and directly targeting RE LNRS's customers and products in the public records sector.

ny-1121099

C. **TransUnion's Acquisition of TLO's Assets**

31.   On October 31, 2013, TransUnion Acquisition Corp. and TLO executed the APA whereby TransUnion agreed to acquire substantially all of TLO's assets out of bankruptcy. As an asset purchase, TransUnion, as the buyer, must make offers of employment to employees of TLO, the seller. Specifically, Section 4.11(b) of the APA states:

> <u>Employment Offers</u>. Prior to the Closing, Buyer shall make offers of "at will" employment (or employment on such other terms as Buyer may, in its sole and absolute discretion, deem acceptable) effective as of the Closing Date to all, or substantially all, of the Employees of the Business, except for those employees who have traditionally provided, and will continue to provide, the CPS Services. Any such "at-will" employment offers will (i) be contingent on the Closing occurring; (ii) be subject to, and in compliance with, Buyer's standard human resources, ethics and compliance policies and procedures, including requirements for proof evidencing a legal right to work; (iii) have terms, including the position, compensation (at market-competitive levels) and responsibilities of such Employee, that will be determined by Buyer; (iv) supersede any prior employment agreements (including management, employment, severance, consulting, relocation, retention, visa, or work permit) in effect with the Seller prior to the Closing Date; and (v) be contingent on each such Employee's completing, in a manner satisfactory to Buyer, an employment application and a background check.

32.   Additionally, pursuant to Section 6.4 of the APA, TLO will terminate each of its employees that will become employees of TransUnion. Section 6.4(a) of the APA states:

> Effective as of the Closing, the Seller shall terminate the employment of each of its Employees who is actively at work on such date, as applicable, and who are designated by Buyer on Schedule 6.4 (as it may be supplemented from time to time by Buyer) as having accepted Buyer's offer of employment. The Seller shall be responsible for paying any accrued compensation owed to the Employees at their termination of employment as may be required under the Bankruptcy Code, provided, for the avoidance of doubt, that Buyer is not assuming any responsibility for paying any accrued compensation as to which Seller is not liable under the Bankruptcy Code.

33.   As a result of the APA, TransUnion will acquire assets and operations that directly compete with RE LNRS's core business. Additionally, TransUnion has agreed to assume Escalante's employment contract.

34.   On November 19, 2013, and again on November 25, 2013, Reed Elsevier sent emails to TransUnion reminding it that TransUnion's hiring of TLO's President and Chief

Operating Officer (Escalante) is prohibited by the no-hire provisions of the December 6, 2012 Agreements since Escalante was part of the "senior management team" referenced in those Agreements.

35. On November 27, 2013, in response to Reed Elsevier's November 19 and November 25 emails, TransUnion's counsel sent a letter asserting its contention that Escalante's employment with a TransUnion entity does not constitute a breach of an enforceable no-hire obligation.

36. Upon information and belief, the sale of TLO assets to TransUnion is scheduled to close on or about December 15, 2013.

37. Upon information and belief, TransUnion has solicited Escalante for employment at TransUnion and has agreed to hire Escalante as an employee of a TransUnion entity in breach of the Peck Agreement and the TransUnion Agreement.

38. TransUnion intends to hire Escalante, RE LNRS's former CTO and a member of the "senior management team," referenced in the December 6, 2012 Agreements to exploit Escalante's vast knowledge of extremely valuable confidential and proprietary technology and information regarding RE LNRS's technical systems and operations to compete with RE LNRS. This is precisely the harm that the December 6, 2012 Agreements were designed and intended to prevent and was precisely the consideration that Reed Elsevier bargained for, in agreeing to allow Peck to join TransUnion.

39. Despite Reed Elsevier's repeated efforts to highlight for TransUnion its contractual obligations under the non-solicitation and no-hire provisions of the Peck Agreement and the TransUnion Agreement, TransUnion now intends to hire Escalante in conjunction with the closing of the sale of TLO's assets and has already agreed to assume and acquire his employment contract with TLO.

ny-1121099

## FIRST CAUSE OF ACTION
**Breach of Contract**

40. Plaintiff incorporates by reference the allegations contained in paragraphs 1 through 39 of the Complaint as though fully set forth herein.

41. The non-solicitation and no-hire restrictions set forth in the TransUnion Agreement constitute a valid and enforceable agreement that imposes upon TransUnion certain contractual obligations.

42. TransUnion, through its agreement to assume Escalante's employment agreement with TLO and its solicitation of Escalante, has breached and will continue to breach the terms of the non-solicitation and no-hire restrictions set forth in the TransUnion Agreement, *inter alia*, by agreeing to hire Escalante upon the closing of the TLO asset purchase, on or about December 15, 2013.

43. If TransUnion is not enjoined from hiring Escalante, and thus violating its obligation under the TransUnion Agreement, Reed Elsevier will be irreparably harmed.

44. Reed Elsevier has suffered and will continue to suffer irreparable harm as a result.

## SECOND CAUSE OF ACTION
**Promissory Estoppel**

45. Plaintiff incorporates by reference the allegations contained in paragraphs 1 through 44 of the Complaint as though fully set forth herein. To the extent that the allegations pled in this Second Cause of Action are inconsistent with the First Cause of Action, the allegations here are made in the alternative.

46. In its agreement with Reed Elsevier, TransUnion made a clear and unambiguous promise not to hire any individual who was a member of the RE LNRS senior management team during calendar year 2012 without first securing Reed Elsevier's consent.

47.     Reed Elsevier reasonably and foreseeably relied to its detriment on TransUnion's promise when it allowed Peck to assume the role of CEO of TransUnion despite the non-competition covenant of Peck's Employment Agreement.

48.     TransUnion, through its agreement to assume Escalante's employment agreement with TLO and its solicitation of Escalante, has reneged upon and will continue to renege upon its clear and unambiguous promise to Reed Elsevier, *inter alia*, by agreeing to hire Escalante upon the closing of the TLO asset purchase, on or about December 15, 2013, thus injuring Reed Elsevier.

49.     If TransUnion is not enjoined from hiring Escalante, and thus from violating its clear and unambiguous promise to Reed Elsevier not to hire any of Peck's RE LNRS senior management team for TransUnion's benefit, Reed Elsevier will be irreparably harmed.

50.     Reed Elsevier has suffered and will continue to suffer irreparable harm as a result.

### THIRD CAUSE OF ACTION
### Tortious Interference with Contract

51.     Plaintiff incorporates by reference the allegations contained in paragraphs 1 through 50 of the Complaint as though fully set forth herein.

52.     The Peck Agreement is a valid and enforceable agreement between Peck and Reed Elsevier.

53.     TransUnion has been aware of the existence of the Peck Agreement since its execution.

54.     At TransUnion's direction, Peck, in his capacity of CEO of TransUnion, has breached and will continue to breach the terms of the non-solicitation and no-hire restrictions set forth in the Peck Agreement, *inter alia*, through his actions in his solicitation of Escalante for employment.

ny-1121099

55. TransUnion has and will continue to intentionally procure the breach of the Peck Agreement.

56. If TransUnion is not enjoined from intentionally procuring further breach of the Peck Agreement, through the hiring of Escalante, Reed Elsevier will be irreparably harmed.

57. Reed Elsevier has suffered and will continue to suffer irreparable harm as a result.

### FOURTH CAUSE OF ACTION
### Declaratory Judgment

58. Plaintiff incorporates by reference the allegations contained in paragraphs 1 through 57 of the Complaint as though fully set forth herein.

59. Through its communications to Reed Elsevier, TransUnion has evidenced its intent to hire, and has already agreed to hire, Escalante.

60. TransUnion and Peck are aware of their no-hire obligations to Reed Elsevier as clearly set forth in the December 6, 2012 Agreements and as evidenced by their prior waiver requests to Reed Elsevier (including a waiver request specifically relating to Escalante). Moreover, Reed Elsevier, through its recent communications to TransUnion, has reminded TransUnion of its obligations under the TransUnion Agreement.

61. Accordingly, an actual, substantial, and justiciable controversy exists as to whether TransUnion's actions have breached and/or will breach the TransUnion Agreement. The Court has jurisdiction to render a declaration that TransUnion's actions have breached, or will breach, the TransUnion Agreement.

### PRAYER

WHEREFORE, Plaintiff prays for judgment against TransUnion as follows:

1. For a temporary restraining order, preliminary injunction and permanent injunction enjoining and restraining TransUnion from hiring and/or employing Escalante at any time before the end of December 31, 2014.

ny-1121099

2.	For a declaration that TransUnion's actions have breached or will breach the TransUnion Agreement.

3.	In the event equitable relief is not available, for damages associated with any breach of TransUnion's and Peck's obligations under the TransUnion Agreement and/or Peck Agreement resulting in the hiring and/or employment by TransUnion of Escalante.

4.	For reasonable attorney's fees according to proof and costs of suit; and

5.	For any such further relief to which Plaintiff may be entitled.

Dated: New York, New York  
December 9, 2013

MORRISON & FOERSTER LLP

By: _____  
Dennis P. Orr (DO 6488)

Attorneys for Plaintiff  
Reed Elsevier Inc.  
1290 Avenue of the Americas  
New York, NY  10104-0050  
Dorr@mofo.com  
212.468.8000