DENNIS P. ORR
DOrr@mofo.com
STEFAN W. ENGELHARDT
SEngelhardt@mofo.com
LaSHANN M. DeARCY
LDeArcy@mofo.com
MORRISON & FOERSTER LLP
1290 Avenue of the Americas
New York, NY 10104-0050
212.468.8000
Attorneys for Plaintiff
Reed Elsevier Inc.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| REED ELSEVIER INC.,<br><br>Plaintiff,<br><br>v.<br><br>TRANSUNION HOLDING COMPANY, INC.,<br><br>Defendant. | No. 13-CV-8739 (PKC)<br><br>**REPLY BRIEF IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION** (Fed. R. Civ. P. 65) |

# TABLE OF CONTENTS

Page


PRELIMINARY STATEMENT ..... 1

ARGUMENT ..... 2

I. THIS ACTION IS NOT AN IMPERMISSIBLE COLLATERAL ATTACK ON THE BANKRUPTCY COURT'S ORDER ..... 2

II. THE NO-HIRE PROVISIONS ARE REASONABLE AND ENFORCEABLE ..... 6

III. REED ELSEVIER WILL SUFFER IRREPARABLE HARM IN THE ABSENCE OF A PRELIMINARY INJUNCTION ..... 7

A. Escalante Is a Unique Employee Whose Collaboration With a Competitor Will Cause RE LNRS Irreparable Harm ..... 8

B. Allowing Escalante to Work for TransUnion Will Damage RE LNRS's Relationships With Its Employees and Customers ..... 9

CONCLUSION ..... 10

## TABLE OF AUTHORITIES

Page(s)

CASES

*Am. Broad. Cos., Inc. v. Wolf*,
52 N.Y.2d 394, 420 N.E.2d 363 (1981)....7

*Bradford v. New York Times Co.*,
501 F.2d 51 (2d Cir. 1974)....9

*Celotex Corp. v. Edwards*,
514 U.S. 300 (1995)....4

*Cenveo Corp. v. Diversapack LLC*,
No. 09 Civ. 7544 (SAS), 2009 U.S. Dist. LEXIS 91535 (S.D.N.Y. Oct. 1, 2009)....6

*Gill, Korff & Assoc., Architects & Eng'r, P.C. v. Cnty. of Onondaga*,
544 N.Y.S.2d 393 (App. Div. 4th Dep't 1989)....7

*Global Telesystems, Inc. v. KPNQwest, N.V.*,
151 F. Supp. 2d 478 (S.D.N.Y. 2001)....6, 7

*Harford Fire Ins. Co. v. Federated Dep't Stores, Inc.*,
723 F. Supp. 976 (S.D.N.Y. 1989)....7

*In re Adelphia Recovery Trust*,
634 F.3d 678 (2d Cir. 2011)....5

*In re Hooker Investments, Inc.*,
131 B.R. 922....3

*McMahon v. Providence Capitol Enter., Inc.*,
222 B.R. 205 (S.D.N.Y. 1998)....3

*Marsh USA Inc. v. Karasaki*,
09 Civ. 4195 (JGK), 2009 U.S. Dist. LEXIS 90986 (S.D.N.Y. Oct. 31, 2008)....9

*Natsource LLC v. Paribello*,
151 F. Supp. 2d 465 (S.D.N.Y. 2001)....9

*Northern Pipeline Const. Co. v. Marathon Pipe Line Co.*,
458 U.S. 50 (1982)....3

*Orion Pictures Corp. v. Showtime Networks, Inc.*,
4 F.3d 1095 (2d Cir. 1993)....3

*Penthouse Media Grp., Inc. v. Pachulski Stang Ziehl & Jones LLP*,
406 B.R. 453 (S.D.N.Y. 2009)....................................................................................5

*Reed Elsevier Inc. v. TransUnion Holding Co.*,
No. 13-CV-8739 (PKC) (S.D.N.Y. Dec. 13, 2013) ..................................................1

*Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*,
490 B.R. 46 (S.D.N.Y. 2013)....................................................................................3

*Stern v. Marshall*,
131 S. Ct. 2594 (2011) *reh'g denied*, 132 S. Ct. 56, 180 L. Ed. 2d 924 (U.S. 2011) ............3, 4

*Ticor Title Ins. Co. v. Cohen*,
173 F.3d 63 (2d Cir. 1999)........................................................................................8

**STATUTES**

11 U.S.C. § 363 ..........................................................................................................5

**OTHER AUTHORITIES**

Robert W. Wood, Corporate Acquisitions and Mergers, pt.3 §5C…………………………….....6

# PRELIMINARY STATEMENT

Defendant TransUnion Holding Company, Inc.'s ("TransUnion") response to Plaintiff Reed Elsevier Inc.'s ("Reed Elsevier") motion for a preliminary injunction is a remarkable collection of irrelevancies, non sequiturs, and outright misrepresentations, most of which TransUnion has offered up before and none of which blunt the force of Reed Elsevier's position that it will be irreparably harmed by TransUnion's blatant breach of contract.[1] While we could exceed the page limit on this brief by addressing each and every one of TransUnion's diversions, we respond here to a handful of TransUnion's misbegotten claims:

- **This case is a collateral attack on the TLO bankruptcy court auction because Reed Elsevier should have brought its claims against TransUnion in that court.** *See* Mem. Opp'n to Pl.'s Mot. Prelim. Inj. and TRO ("Def.'s Mem.") at 12-15. Simply put, Reed Elsevier's claims against TransUnion do not and did not belong in the TLO bankruptcy proceeding. The law does not require a non-bankrupt corporation to bring its state law claims against another non-bankrupt corporation in a bankruptcy court presiding over an unrelated bankruptcy. Indeed, TLO's bankruptcy court would have no jurisdiction to adjudicate such a claim.

- **An injunction will deprive Escalante of his livelihood.** *See* Def.'s Mem. at 27-28. TransUnion trots out this canard throughout its papers. As this Court pointed out at the December 13, 2013 hearing: even if TransUnion is unable to hire Escalante, "Mr. Escalante [has] a right to be paid [by TransUnion] under the employment agreement[.]" Transcript of Temporary Restraining Order Hearing ("Transcript") at 32, *Reed Elsevier Inc. v. TransUnion Holding Co.*, No. 13-CV-8739 (PKC) (S.D.N.Y. Dec. 13, 2013).

- **TransUnion acquired "the TLO business" and thus inherited Escalante with it.** *See* Def.'s Mem. at 17-19. This assertion is a misrepresentation of the transaction through which TransUnion acquired TLO's assets. TLO's assets were acquired through an asset purchase facilitated through the bankruptcy court auction, not a stock purchase. It is disingenuous to suggest that Escalante's employment agreement automatically transferred to TransUnion as a result of the asset purchase and, in fact, the Escalante employment agreement is <u>the only employment agreement</u> listed in the appendix of the APA. TransUnion made a conscious decision to acquire that contract despite the TransUnion Agreement with Reed Elsevier.

- **Because TransUnion is purportedly not planning to use the HPCC platform, it may breach its no-hire obligation with impunity.** Def.'s Mem. at 25-26, 32-33. As has

[1] Capitalized terms in this Reply will have the same meaning as in Plaintiff's opening submission.

been made plain in Reed Elsevier's motion papers, the injury Reed Elsevier will suffer in the absence of an injunction goes well beyond the concerns surrounding the HPCC system and includes the unfair competitive effect of having two former senior RE LNRS executives competing in the marketplace against RE LNRS over the next year. Simply put, the centerpiece of the deal that enabled James Peck to become CEO of TransUnion was TransUnion's and Peck's agreement not to hire a relatively small, finite number of individuals for a short period of time—an agreement upon which TransUnion is now seeking to renege.

- **The no-hire obligation is anti-competitive and violates public policy.** *Id.* at 24, 33-34. This contention is yet another example of words rocketing out of both sides of TransUnion's mouth. In none of the seven previous instances in which TransUnion sought waivers of the no-hire agreement did TransUnion suggest any impropriety in the obligation it was at that time fulfilling. Indeed, in at least one instance, John Blenke, the general counsel of TransUnion who negotiated the TransUnion Agreement on its behalf, indicated that he understood and would respect the interest Reed Elsevier was seeking to protect if it declined a waiver. Interestingly, in its thirty-five page brief, TransUnion makes no effort to explain these previous seven waiver requests. Perhaps not surprisingly, TransUnion's counsel, Jonathan Rosenfeld, twice explicitly conceded before this Court at the TRO Hearing that the TransUnion Agreement was "not unenforceable on its face." Transcript at 22-23.

Reed Elsevier asks this Court to see through TransUnion's diversions and to focus instead on the incontrovertible facts presented by this motion: the TransUnion Agreement is a binding, enforceable contract; TransUnion will breach that contract by hiring Escalante; and Reed Elsevier will suffer irreparable harm as a result. A preliminary injunction is warranted.

## ARGUMENT

### I. THIS ACTION IS NOT AN IMPERMISSIBLE COLLATERAL ATTACK ON THE BANKRUPTCY COURT'S ORDER.

Reed Elsevier's claims are properly before this Court. Defendant TransUnion attempts to distract the Court from TransUnion's clear violation of a binding and enforceable contract by claiming that this action somehow constitutes a collateral attack on a bankruptcy court's approval of the TLO asset sale. In particular, TransUnion posits that Reed Elsevier, a non-party to the TLO bankruptcy proceeding, was required to bring its independent state law contract claims against TransUnion, another non-party, simply because an affiliate participated in a

bankruptcy court auction for a debtor's assets. Def.'s Mem. at 14. TransUnion's argument is wholly unsupported by law and demonstrates a misapprehension of the constitutional limits on the bankruptcy court's authority.

The law is clear that bankruptcy courts lack constitutional authority to determine Article III claims sounding in contract or tort. *See Stern v. Marshall*, 131 S. Ct. 2594, 2609 (2011) *reh'g denied*, 132 S. Ct. 56, 180 L. Ed. 2d 924 (U.S. 2011); *Northern Pipeline Const. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 53, 87 (1982) (bankruptcy court lacked authority to enter final judgment on a state law claim). Article I courts are not empowered to adjudicate matters "of private right, that is, of the liability of one individual to another under the law as defined." *Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 490 B.R. 46, 50 (S.D.N.Y. 2013) (internal citations omitted). Instead, the bankruptcy court is limited to adjudicating claims that are "necessarily resolvable by a ruling on the creditor's proof of claim in bankruptcy." *Stern*, 131 S. Ct. at 2609 (internal citations omitted). Thus, "[w]hen a suit is made of the stuff of the traditional actions at common law tried by the courts at Westminster in 1789, and is brought within the bounds of federal jurisdiction, the responsibility for deciding that suit rests with Article III judges in Article III courts." *Id.* (internal citations omitted).[2] In this case, the action

[2] Courts in this Circuit have long recognized the jurisdictional limitations placed on bankruptcy courts. For example, in *Orion Pictures Corp. v. Showtime Networks, Inc.*, the Second Circuit held that "it was error for the bankruptcy court to decide a disputed factual issue between the parties to a contract in the context of determining whether the debtor or trustee should be permitted to assume that contract." 4 F.3d 1095, 1098 (2d Cir. 1993). There, the bankruptcy court had determined that a provision of a contract sought to be assumed had not been breached. *Id*. Finding the bankruptcy court's review of the contract in error, the Second Circuit concluded that bankruptcy court is "not the time or place for prolonged discovery or a lengthy trial with disputed issues." *Id. See also In re Hooker Investments, Inc.*, 131 B.R. 922, 931 (noting that "the scope of inquiry at [a bankruptcy] hearing was a limited one intended to allow the Debtor to expeditiously rid itself of a burdensome contract while continuing towards its goal of reorganization."). Likewise, in *McMahon v. Providence Capitol Enter., Inc.*, the Southern District granted a motion to withdraw a breach of contract claim from bankruptcy court on the grounds that the court lacked authority conclusively to resolve the claim. 222 B.R. 205, 207 (S.D.N.Y.1998).

before the Court is "a state law action independent of the federal bankruptcy law." *Id.* As such, the bankruptcy court could not and should not have heard Reed Elsevier's claims.

In an effort to somehow save its anemic argument, TransUnion relies extensively on *Celotex Corp. v. Edwards* for its contention that Reed Elsevier's failure to object to the assumption of Escalante's contract constitutes a waiver of its claims. *Celotex* is clearly inapposite and does nothing to defeat Reed Elsevier's claims. In *Celotex*, the bankruptcy court issued an injunction barring plaintiffs from executing on a debtor's posted bond. 514 U.S. 300, 301-303 (1995). In direct contravention of that injunction, the plaintiffs attempted to enforce against the bond in district court. *Id*. Under those specific facts, the Supreme Court held that the attempt to enforce the bond in district court was a collateral attack on the injunction and contrary to law. *Id.* at 313.

No such circumstances exist in this case. There is no injunction against Reed Elsevier, and Reed Elsevier has made no claim against the debtor TLO. Moreover, the only order issued by the bankruptcy court was one approving the TLO asset sale, including the assignment of Escalante's contract to TransUnion. Reed Elsevier, however, is neither challenging that order nor acting in contravention of it. Reed Elsevier likewise is not seeking to overturn TransUnion's assumption of Escalante's employment agreement. Rather, Reed Elsevier's suit relates exclusively to TransUnion's breach of its separate agreement with Reed Elsevier, one that was never, and never could have been, before the bankruptcy court.[3]

Next, TransUnion contends that Reed Elsevier's claims will be defeated because Escalante's employment contract was transferred "free and clear" of any claims against it. Def.'s

[3] Notably, TransUnion fails to apprise this Court that it both failed to advise the bankruptcy court of its contractual obligation not to hire Escalante through the end of 2014 and also affirmatively misrepresented that its performance under the Asset Purchase Agreement ("APA") would <u>not</u> violate any other agreement.

Mem. at 12. TransUnion's argument is not sustainable. The power to sell assets "free and clear" under Section 363 of the Bankruptcy Code pertains to interests of third parties in property of the *bankruptcy estate*. *See* 11 U.S.C. § 363. As such, an order approving the sale of assets "free and clear" does not resolve independent claims that concern those assets. *See In re Adelphia Recovery Trust*, 634 F.3d 678, 694 (2d Cir. 2011) (holding that an order approving sale of loans "free and clear" in no way resolved subsequent fraudulent transfer action concerning those loans). Moreover, contrary to TransUnion's representations, the "free and clear" language in the sale order plainly does not apply to "all objections or claims of third parties." Def.'s Mem. at 15. Rather, the sale order language applies only to those holding interests against or in the *debtor* or the *debtor's* interests in the acquired assets. *See* Udow Decl. at ¶ 19, Ex. 6 ("The trustee (i.e. the Debtor) may sell property under subsection (b) or (c) of this section free and clear of any interest in such property of an entity other than the estate . . . .").

Finally, TransUnion grossly mischaracterizes the Bidding Procedures Order and the identity of entities obligated to object pursuant to that order. TransUnion claims that under the Bidding Procedures Order, any and all interested parties had to file timely objections to the assumption and assignment of contracts. Def.'s Mem. at 13. The Bidding Procedures Order, however, clearly only requires *counterparties* to the contracts to be assumed and assigned to file objections. *See* Declaration of Philip Anker ¶ 5, Ex. B (requiring notice and service "on the *counterparties* to each executory contract and unexpired lease") (emphasis added). The Bidding Procedures Order, therefore, does not bar Reed Elsevier's claims here.[4]

[4] TransUnion also claims that Reed Elsevier's breach of contract, promissory estoppel and tortious interference claims are barred as *res judicata* via the bankruptcy court's order approving the asset sale. This argument fails as a matter of law. In order for a claim to be barred as *res judicata*, a moving party must establish that the matter was (1) finally and actually adjudicated on the merits; (2) involved the same parties; (3) that the court was of competent jurisdiction; and (4) that the causes of action were the same in both cases. *See Penthouse Media Grp., Inc. v. Pachulski Stang Ziehl & Jones LLP*, 406 B.R. 453, 458 (S.D.N.Y. 2009). TransUnion cannot establish any of these

(Footnote continues on next page.)

## II. THE NO-HIRE PROVISIONS ARE REASONABLE AND ENFORCEABLE.

As set out in detail in Plaintiff's opening submission, the TransUnion Agreement is enforceable in that it protects Reed Elsevier's legitimate business interests, is reasonable in both duration and scope, and furthers the public interest. Nothing in TransUnion's opposition undermines this conclusion.[5]

Moreover, TransUnion's attempt to now cast the no-hire provisions as unreasonable because they unfairly deprive Escalante of his employment is without merit. Def.'s Mem. at 28.[6] As a practical matter, Escalante will not suffer any hardship if TransUnion were enjoined from employing his services because Escalante's employment agreement expressly provides for compensation upon his termination. *See* Declaration of Phillip Anker, Ex. D. Even if TransUnion could somehow demonstrate hardship on Escalante, the Southern District of New York considered and rejected this very argument in *Global Telesystems, Inc. v. KPNQwest, N.V.*, 151 F. Supp. 2d 478 (S.D.N.Y. 2001). In that case, the court declined to allow a company to avoid its obligations under a no-hire agreement by asserting a claim of hardship to a prospective

---

(Footnote continued from previous page.)

elements. First, the breach of contract, promissory estoppel and tortious interference with contract claims brought here were not and could not be finally adjudicated on the merits by the bankruptcy court. Second, the claims here are between TransUnion and Reed Elsevier, not TransUnion and TLO, the two parties bound by the court-approved APA. Third, as noted above, the bankruptcy court was not a court of competent jurisdiction for purposes of resolving independent state actions. Fourth, the causes of action were clearly not the same in both cases.

[5] In its analysis of the enforceability of restrictive covenants, TransUnion repeatedly relies on the case *Cenveo Corp. v. Diversapack LLC*, No. 09 Civ. 7544 (SAS), 2009 U.S. Dist. LEXIS 91535 (S.D.N.Y. Oct. 1, 2009). However, this reliance is misplaced because the court in *Cenveo* found that the no-hire covenant at issue was unenforceable principally because the parties were not competitors. That is clearly not the situation in this case.

[6] TransUnion attempts to create a false distinction between "hiring" Escalante and negotiating for the assumption of his contract through the asset sale. Def.'s Mem. at 17-18. This is a distinction without a difference. In an asset purchase the buyer molds the transaction to fit its needs and desires; it is not an all-or-nothing transaction. *See* Robert W. Wood, Corporate Acquisitions and Mergers, pt.3 §5C. Therefore, TransUnion's assumption of Escalante's employment contract was not automatic or required. TransUnion specifically structured the APA to include Escalante's employment agreement. Udow Decl. at ¶ 19, Ex. 6, Schedule 1.1(a)(ix). Unlike the 131 other employee contracts that TransUnion repeatedly refers to, Escalante's was the only employment contract negotiated and assumed in this manner. *Id.* Moreover, even if this had been a stock purchase, TransUnion still would not have automatically acquired Escalante's employment contract. TransUnion would have been required to cause the seller to assign Escalante's employment contract.

employee who was not party to the agreement and was unaware of the restrictive covenants that applied to his hiring. *Global Telesystems, Inc*., 151 F. Supp. 2d at 483 n.1. The court concluded: "[S]ometimes in life, a person unfortunately walks through the wrong door. Such is the case here and I decline to allow [defendant] to avoid its obligations to [plaintiff] by asserting a claim of hardship to [employee]." *Id.* The same result should be reached in this case.[7]

## III. REED ELSEVIER WILL SUFFER IRREPARABLE HARM IN THE ABSENCE OF A PRELIMINARY INJUNCTION.

Reed Elsevier will suffer irreparable harm if this Court does not grant injunctive relief. TransUnion's opposition brief does not counter this fact, but instead merely distracts from what is at stake. That is, TransUnion mischaracterizes Reed Elsevier's concerns about Escalante's potential employment with TransUnion as being solely focused on the vulnerability of Reed Elsevier's trade secrets and the appropriation of the HPCC technology. Def.'s Mem. at 31-32. While the possible misuse of confidential trade secrets remains a compelling threat, alone justifying injunctive relief, TransUnion fails to grasp Reed Elsevier's fundamental concern: the reunion of the powerful team of Escalante and Peck. As set forth below, the combination of these two unique former high-level RE LNRS senior executives poses a threat to Reed Elsevier that, if realized, will result in irreparable harm.

[7] TransUnion claims that if this Court finds that the no-hire obligation is unenforceable as a matter of public policy, a claim for promissory estoppel is not available. They fail, however, to cite a single case from this jurisdiction to support this proposition. First, they inappropriately rely upon a case concerning the implied covenant of good faith and fair dealing. Def.'s Mem. at 29. *See Am. Broad. Cos., Inc. v. Wolf*, 52 N.Y.2d 394, 406, 420 N.E.2d 363 (1981). Reed Elsevier, however, has brought no such claim. Reed Elsevier's claim for promissory estoppel is independent from the TransUnion Agreement and thus survives even if this Court finds the TransUnion Agreement unenforceable as a matter of law. *See Harford Fire Ins. Co. v. Federated Dep't Stores, Inc.*, 723 F. Supp. 976, 993 (S.D.N.Y. 1989). Second, they cite a case concerning a claim in *quantum meruit* where the contract involving a municipality was void as a matter of statutory, not common, law. Def.'s Mem. at 29. *See Gill, Korff & Assoc., Architects & Eng'r, P.C. v. Cnty. of Onondaga*, 544 N.Y.S.2d 393, 394 (App. Div. 4th Dep't 1989). Neither case supports the proposition that a promissory estoppel claim supported by extensive reasonable reliance cannot be enforced as a matter of public policy.

**A. Escalante Is a Unique Employee Whose Collaboration With a Competitor Will Cause RE LNRS Irreparable Harm.**

As a matter of law, "[i]f the unique services of such employee [sic] are available to a competitor, the employer obviously suffers irreparable harm." *Ticor Title Ins. Co. v. Cohen*, 173 F.3d 63, 70 (2d Cir. 1999). Here, Reed Elsevier's claims concern not one, but two separately unique former employees.

Both Peck and Escalante were high-ranking members of RE LNRS's senior executive team. In his position as CEO, Peck had high-level insight into and, indeed, defined the strategic plans of RE LNRS. Udow Decl. at ¶ 10. As CTO, in contrast, Escalante acquired a micro level understanding of the details of RE LNRS's customers and their key issues—the purpose for which customers use the RE LNRS analytics, how they used them, and the limits on RE LNRS capabilities. Raghavan Decl. at ¶ 9. Moreover, Escalante is aware of any gaps in RE LNRS's technology and of RE LNRS's HPCC roadmap as of 2012. This knowledge can easily be put to use by Escalante to assist any effort by Peck to build and market new competitive products for TransUnion, particularly with the use of the TLO assets that directly compete with RE LNRS. As the evidence will show, contrary to TransUnion's assertions, Peck and Escalante's knowledge of Reed Elsevier's technical and strategic plans are far from stale. Reed Elsevier devises three-year, highly confidential strategic plans to plot their competitive and technological course for the future—the last of which was presented by Peck in September 2012. This proprietary strategic plan remains critical to the competitive success of RE LNRS. Put simply, alone, each of Peck and Escalante has limited ability to shape the competitive landscape against Reed Elsevier. Together, however, they have a complete picture of RE LNRS, which they can leverage to the competitive disadvantage of RE LNRS. Indeed, this very real concern is the precise reason that

Reed Elsevier ensured that the no-hire agreement was crafted to include senior-level employees—especially Escalante—in the first place. Udow Decl. ¶ 13.

Unable to refute these facts, TransUnion claims that Escalante is not special, unique, or extraordinary simply because he left RE LNRS over one year ago. Def's Mem. at 24-25. However, the length of time since Escalante's departure from RE LNRS has absolutely no legal bearing on whether he is a unique employee. *See Bradford v. New York Times Co.*, 501 F.2d 51, 55, 58 (2d Cir. 1974) (holding that a former executive was unique even where covenant was challenged four years after his departure).

**B. Allowing Escalante to Work for TransUnion Will Damage RE LNRS's Relationships With Its Employees and Customers.**

Courts in this Circuit have also recognized that a loss of client relationships and customer goodwill from the violation of a restrictive covenant generally constitutes irreparable harm. *See, e.g., Marsh USA Inc. v. Karasaki*, 09 Civ. 4195 (JGK), 2009 U.S. Dist. LEXIS 90986, at *41 (S.D.N.Y. Oct. 31, 2008). Courts so hold because "the total monetary value of [the] loss of a client would be very difficult, if not impossible, to calculate with any exactitude." *Id.* As the evidence shows, the combination of Peck and Escalante at TransUnion will have the imminent potential to draw away customers. Together, they will have significant credibility with customers because they will be able to showcase that together, they created one of the most advanced, efficient, and lowest cost big data analytics programs. They will also be able to claim that they are in the process of creating even better technology.

In addition, Reed Elsevier has a very real concern that allowing Escalante to work for TransUnion in spite of the no-hire agreement will have a devastating effect on its ability to retain current employees. This court has recognized that a company will be irreparably harmed if a departing employee encourages other employees to leave to join a competitor. *Natsource LLC v.*

*Paribello*, 151 F. Supp. 2d 465, 469 (S.D.N.Y. 2001). Similarly, Reed Elsevier has identified the potential hiring away of additional technology staff as one of its gravest concerns. As the evidence shows, Escalante is keenly aware of the strengths and weaknesses of RE LNRS's technology personnel. While at RE LNRS Peck and Escalante led, managed, and mentored the technology team, which resulted in strong and lasting relationships with other RE LNRS employees over the years. The reunion of Peck and Escalante would undoubtedly attract additional technology personnel away from RE LNRS to join TransUnion. Moreover, permitting TransUnion to flout a valid no-hire agreement would also damage Reed Elsevier's credibility with its current employees, leaving them with little incentive to honor their own obligations. The resulting harm from the potential loss of customers and employee departures would be both irreparable and impossible to quantify.

## CONCLUSION

For the reasons set forth above and in its opening submission, Reed Elsevier respectfully requests that the Court grant Reed Elsevier's Motion for a Preliminary Injunction, and grant such further relief as it deems necessary.

Dated: New York, New York
December 30, 2013

MORRISON & FOERSTER LLP

By: /s/ Dennis P. Orr

Dennis P. Orr
DOrr@mofo.com
Attorney for Plaintiff
Reed Elsevier Inc.
1290 Avenue of the Americas
New York, NY 10104-0050
212.468.8000