UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x

REED ELSEVIER INC.,

                                        Plaintiff,                                13 Civ. 8739 (PKC)

                    -against-

TRANSUNION HOLDING COMPANY, INC.,                             MEMORANDUM
                                                                                    AND ORDER

                                        Defendant.
-----------------------------------------------------------------x

CASTEL, District Judge:

          Plaintiff Reed Elsevier Inc. ("REI") has moved for a preliminary injunction

enforcing a provision of a December 6, 2012 agreement with defendant TransUnion Holding

Company, Inc. ("TransUnion") restricting TransUnion's right to hire members of the senior

management team of one of REI's units.  Specifically, REI seeks to prevent TransUnion from

hiring Armando Escalante, who served as chief technology officer of REI's Lexis Nexis Risk

Solutions division ("RE LNRS") from November 2004 to April 2012.  Escalante has served as

the chief operating officer of TLO, LLC ("TLO"), a competitor of REI, since July 25, 2013.  The

essence of REI's claim is that Escalante's employment became violative of the restriction when,

on December 15, 2013, TransUnion acquired substantially all of the assets of TLO.

          After an evidentiary hearing, the Court concludes that REI has failed to establish a

probability of success on the merits of its claims.  Specifically, it has failed to demonstrate a

protectable interest under New York law in enforcement of restriction as to the hiring of

Escalante.  Accordingly, REI's motion for a preliminary injunction is denied.  Set forth below

are the Court's findings of fact and conclusions of law.

USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 1-9-14

FACTS

The Parties

REI, a Massachusetts corporation with its principal place of business in New York, is a publisher and information provider operating in the science, medical, legal, risk, and business sectors. RE LNRS, one of REI's largest divisions, is a data service provider in the risk analysis sector, providing technology, data, and analytics to clients in professional industries and government to help them assess, predict, and manage risk.

TransUnion is a Delaware corporation with its principal place of business in Chicago, Illinois. The company is the third-largest consumer credit bureau in the United States, providing credit information and risk management services to businesses and consumers.

The Departure of James Peck and the Restrictive Covenants

Essential to an understanding of the present controversy is the circumstance surrounding the departure of James Peck as CEO of RE LNRS and his hiring by TransUnion. Peck began working for LexisNexis, a subsidiary of REI, in 1999. He was elevated to CEO of the company's risk management division in 2005, and became the CEO of RE LNRS after REI separated its LexisNexis Group into separate divisions. On or around October 31, 2011, Peck entered into an employment agreement in connection with his appointment as CEO of RE LNRS. Peck's employment agreement with RE LNRS contained restrictive covenants, including a non-competition covenant prohibiting him from accepting a position with a competitor of RE LNRS within twelve months of his termination date. (Decl. of Henry Udow, Ex. 1 at § 11) This section of the agreement also provides a post-employment confidentiality restriction, which states that Peck "will not use, disclose, reveal, publish, or make available to any person or any firm,

company, or other entity any Confidential Information." Id. The confidentiality provision has no temporal limitation. Id.

In November 2012, Peck received an employment offer to become CEO of TransUnion. Because the non-competition clause in his employment contract barred him from accepting this position, Peck approached Erik Engstrom, the CEO of REI, to request a waiver of the non-competition covenant. Although REI and TransUnion were competitors, at the time the two companies also had significant bilateral customer and supplier relationships. Accordingly, REI was willing to conditionally accommodate Peck's request, and REI's general counsel entered into negotiations with Peck's independent counsel and TransUnion's general counsel. On December 6, 2012, REI agreed to grant Peck a waiver in exchange for certain contractual safeguards, specifically, a new set of restrictive covenants. These covenants were set forth in two separate agreements: one between REI and Peck (the "Peck Agreement"), and the other between REI and TransUnion (the "TransUnion Agreement).

Both the Peck Agreement and the TransUnion Agreement contained substantially similar restrictive covenants prohibiting Peck and TransUnion, respectively, from hiring certain employees of REI or RE LNRS without the prior written consent from REI. (Udow Decl., Exs. 2 and 3, § 3) The relevant covenant in the TransUnion Agreement places restrictions on TransUnion's right to hire members of senior management until December 31, 2014. Id., Ex. 3. Specifically, it provides:

> TransUnion agrees to abide by the non-solicitation restrictions set forth in Section 11(c)(i) of [Peck's] Employment Agreement and in addition further agrees that: (i) through December 31, 2014, TransUnion will not, without the prior written consent of Reed Elsevier's Global Human Resources Director, hire any individual who was on the senior management team of [RE LNRS] at any time during calendar year 2012 (the "senior management team" means those employees who reported directly to Mr. Peck, or reported to any of Mr. Peck's direct reports); and

> (ii) through December 31, 2013, TransUnion will not without the prior written consent of Reed Elsevier's Global Human Resources Director, hire any other individual who is employed by [REI] (or any subsidiary or affiliate) at any time during calendar year 2012 provided, however, that with respect to this clause (ii) only [REI] agrees not to unreasonably withhold consent and further agrees that in the event TransUnion unknowingly hires such an individual it will have 60 days to cure its breach of this provision by terminating such individual's employment with it or obtaining the required consent.

Id., ex. 3 at 3. It is this covenant between REI and TransUnion that REI seeks to enforce through this motion. There is no dispute that, during calendar year 2012, Escalante was a member of the "senior management team" as the term is defined in the agreement.

Armando Escalante's Employment

Escalante served as chief technology officer of RE LNRS from November 2004 through May 2012. In this position, Escalante was charged with overseeing a wide range of the Risk Solutions division's tasks, including product development, technology systems, research, IT services, quality assurance, and project management. Escalante's employment contract with RE LNRS contained certain post-employment restrictions similar to those of Peck's original RE LNRS employment agreement, including a one year non-competition provision and ongoing confidentiality obligations.

In May 2012, seven months prior to James Peck's departure from RE LNRS, Escalante left RE LNRS to become the chief operating officer of Opera Solutions, where he worked until February 2013. He then left Opera and worked for six months at a small start-up company. REI makes no claims based upon his employment by Opera Solutions or the start-up.

On July 25, 2013, Escalante joined TLO as its president and chief operating officer. TLO was a corporation headquartered in Florida that competed directly with RE LNRS

in providing information solutions to the business and government sectors, specifically in the collections, law enforcement, financial services, fraud prevention, private investigations, and government services markets. In his position with TLO, Escalante oversaw the company's operations, including its products and technology. Although TLO was a competitor of RE LNRS, the one-year non-competition restriction in Escalante's employment agreement with REI had expired by the time he accepted the position. As will be seen, REI asserts that his employment by its competitor TLO became unlawful when, on December 15, 2013, its assets were acquired by TransUnion, the party to the December 6, 2012 no-hire covenant.

### TLO's Bankruptcy and Asset Sale

On May 9, 2013, TLO filed a petition for reorganization under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of Florida. In re TLO, LLC, No. 13-20853 (Bankr. S.D. Fla. 2013) (Dkt. No. 1). The marketing process for a sale of substantially all of TLO's assets began when TLO retained an investment bank on July 24, 2013; ultimately, twelve parties including REI and TransUnion submitted written indications of interest. TransUnion was selected as the "stalking horse" bidder, and on or around October 31, 2013, the company entered into a Stalking Horse Asset Purchase Agreement (the "APA") with TLO, which was submitted to the bankruptcy court for approval on the following day. (Udow Decl. at ¶ 19)

REI and TransUnion each submitted bids for TLO's assets. TransUnion was selected as the winning bidder at the auction on November 20 and 21, 2013. Id. at ¶ 20. The sale was approved over the objection of REI by the bankruptcy court at a November 22, 2013 hearing. (Decl. of Curtis Miller at ¶ 8) The order approving the sale was entered on December

13, 2013.  (In re TLO, LLC, No. 13-20853 (Bankr. S.D. Fla. 2013), Dkt. No. 610)  Under the

terms of the APA, TransUnion will assume Escalante's contract.  Id. at Schedule

1.1(a)(ix)(Assigned Contracts).  After correspondence by the counsel of REI and TransUnion

failed to resolve the dispute, REI filed a complaint and the instant motion seeking injunctive

relief.


Procedural History

        After filing its complaint on December 9, 2013, REI filed the instant motion and

accompanying declarations on December 12, 2013.  (Dkt. Nos. 1 and 11)  The Court heard

extensively from the parties and received declarations from TransUnion at oral argument on

December 13, 2013 (the "TRO Hearing").  Also on December 13, 2013, the bankruptcy court

entered its order approving the sale of substantially all of TLO's assets, approving the

assumption and assignment of certain executory contracts and unexpired leases, and granting

related relief.  (In re TLO, LLC, No. 13-20853, Dkt. No. 610)  The sale closed on December 15,

2013.

        TransUnion made certain representations as to the limited nature of the services

Escalante would perform until the preliminary injunction hearing and, on that basis and with the

consent of REI, it became unnecessary for the Court to rule on the application for a temporary

restraining order.

        The Court held an evidentiary hearing on the motion for a preliminary injunction

on January 6, 2014.  Henry Udow, the chief legal officer of REI's parent companies, and Mohit

Kapoor, the chief information and technology officer of TransUnion, testified.  Declarations and

exhibits were received into evidence.  At the conclusion of testimony, the Court heard arguments.

ANALYSIS

A.  Jurisdiction & Propriety of REI's Motion

As a threshold matter, TransUnion argues that REI's complaint and the instant motion are impermissible collateral attacks on the bankruptcy court's December 13, 2013 order approving the sale of substantially all of the assets of TLO to TransUnion.  TransUnion correctly notes that a line of cases beginning with Celotex v. Edwards, 514 U.S. 300 (1995), has established a rule against collateral attacks on orders of the bankruptcy courts.  In Celotex, plaintiffs who had prevailed in an asbestos suit against the debtor violated an injunction issued by a bankruptcy court, which barred the plaintiffs from executing on the debtor's supersedeas bonds, by instituting a collateral proceeding to collect on the bonds.  Id. at 302-04.  Id.  The Supreme Court held that the suit to collect on the bonds was barred as an impermissible collateral attack on the bankruptcy court's order.  Id. at 313.

Relying upon Celotex, courts have precluded collateral attacks upon other types of bankruptcy court orders, including those authorizing the sale of assets.  See In re Christ Hosp., 502 B.R. 158 (Bankr. D.N.J.) (state tort claims for tortious interference and unfair competition in connection with purchaser's acquisition of certain of debtor's assets in a sale under 11 U.S.C. § 363 were barred as impermissible collateral attacks); GAF Holdings, LLC v. Rinaldi (In re Farmland Indus., Inc.), 376 B.R. 718 (Bankr. W.D. Mo. 2007), aff'd on other grounds, 639 F.3d 402 (8th Cir. 2011) (action in state court largely redundant of an earlier 60(b) motion seeking relief from the bankruptcy court's sale order was an impermissible collateral attack); Spartan

Mills v. Bank of Am. Illinois, 112 F.3d 1251, 1254 (4th Cir. 1997) (action seeking a declaratory judgment declaring plaintiff's lien superior to another lienholder, in contravention of the bankruptcy court's adjudication of the issue 18 months earlier, was an impermissible collateral attack); Travelers Cas. & Sur. Co. of Am. v. Morgan Acquisitions, LLC, No. 10-10965, 2010 WL 2474631, at *6–7 (E.D. Mich. Jun. 14, 2010) (action based on liabilities arising from a development sold by the debtor under 11 U.S.C. § 363 dismissed as an impermissible collateral attack on the bankruptcy court's sale order).  In Farmland, the bankruptcy court found an action to be an impermissible collateral attack where plaintiff sought "to undo the economics of the sale," even though the plaintiff did "not seek to undo the sale with regard to title."  376 B.R. at 726.

TransUnion argues that the bankruptcy court had in rem jurisdiction over all property in the debtor's estate, that Escalante's contract was part of the bankruptcy estate, and that under the bankruptcy court's December 13, 2013 order, TransUnion assumed Escalante's contract.  It further argues that Escalante's agreement with TLO was assumed by TransUnion free and clear of all interests, including REI's purported interest in the contract flowing from the TransUnion Agreement.  See Decl. of Philip Anker, Ex. A at 21 (TransUnion acquires assets "free and clear of any and all Interests and other liabilities of any kind or nature whatsoever . . . however imposed, with any such Interests to attach only to the proceeds of the Sale of the Acquired Assets with the same priority, validity, force, and effect as they now have in or against the Acquired Assets.).

The Court does not agree.  Even if Escalante's employment agreement with TLO, assumed by TransUnion in connection with the APA, were deemed property of the estate, nothing in the instant proceeding seeks to undo this contract assumption.  The injunctive relief

sought by REI in this case is to prevent Escalante from performing certain services for TransUnion in violation of the TransUnion Agreement.  TransUnion's assumption of Escalante's contract conferred benefits separate and apart from the receipt of Escalante's services; for instance, this transaction enabled TransUnion to enforce the confidentiality and non-competition clauses of his TLO employment agreement against him.  Moreover, the sale of substantially all TLO's assets had substantial economic value separate and apart from the receipt of Escalante's services.

Escalante's employment by the debtor, TLO, violated no contractual right of REI. It is the agreement between two non-debtors, REI and TransUnion, that gives rise to REI's claim against TransUnion.  REI's action in this court does not undermine the propriety of the sale process itself, as in Christ Hospital.  502 B.R. at 161.  Nor does REI seek to circumvent the bankruptcy court's determination of lien priority through a declaratory judgment action, as in Spartan Mills.  112 F.3d at 1254.  And although REI objected to approval of the sale on other grounds, REI does not pursue this action to seek a redetermination of substantially the same relief in an alternative forum, as in Farmland.  376 B.R. at 721.

Participation in the bankruptcy auction process and a bankruptcy court's approval of the sale of assets does not, without more, vitiate contractual obligations of non-debtor parties which predate the bankruptcy and are unrelated to the debtor.  Thus, at this preliminary juncture, the Court is satisfied that the instant action is not an impermissible collateral attack on the December 13, 2013 order of the bankruptcy court.

B. Preliminary Injunction Standard

A preliminary injunction is an "extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." Grand River Enterprise Six Nations, Ltd. v. Pryor, 481 F.3d 60, 66 (2d Cir. 2007) (citation omitted). A plaintiff seeking a preliminary injunction must "show (a) irreparable harm and (b) either (1) a likelihood of success on the merits, or (2) sufficiently serious questions going to the merits to be a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief." Citigroup Global Markets, Inc. v. VCG Special Opportunities Master Fund Ltd., 598 F.3d 30, 35 (2d Cir. 2010).

C. REI's Claims

1. New York Law Applies

REI has asserted claims based on breach of contract, promissory estoppel, and tortious interference with contract.

Parties may consent to the application of a particular jurisdiction's law, both before a dispute arises or afterwards during the course of litigation, either explicitly or implicitly, and such consent " 'is sufficient to establish choice of law.' " Krumme v. WestPoint Stevens Inc., 238 F.3d 133, 138 (2d Cir. 2000) (quoting Tehran–Berkeley Civil & Envtl. Engrs and Tippetts–Abbett–McCarthy–Stratton, 888 F.2d 239, 242 (2d Cir. 1989) (finding that the parties' reliance on New York law in their briefs established implied consent to choice of law)). REI argues that New York law applies to the dispute, and TransUnion's briefing implicitly accepts this proposition by relying on New York law throughout its argument. Accordingly, the Court will apply New York law.

2.  By its Assumption of Escalante's Employment Contract, TransUnion has Hired Escalante

TransUnion argues that its assumption of Escalante's contract is not a "hire" within the meaning of the covenant at issue.  In the absence of a grant of injunctive relief, Escalante would effectively become an employee of TransUnion.  At the TRO Hearing, counsel for TransUnion conceded that, after the close of the TLO asset sale, Escalante would be an employee of a subsidiary of TransUnion.  (TRO Tr. at 6)  By its express terms, the TransUnion Agreement applies to both TransUnion and its subsidiaries.  (Udow Decl. Ex. 3)  In his capacity as an employee of a TransUnion subsidiary, Escalante would perform services and be compensated according to the terms of his employment contract with TLO, which TransUnion would assume through its acquisition of TLO.  In short, he would become an employee of TransUnion in every sense of the word.

Significantly, TransUnion made Escalante an employee through its own affirmative actions.  No order of the bankruptcy court and no principle of bankruptcy law required TransUnion to assume Escalante's contract in order to close the bankruptcy sale or to acquire substantially all of TLO's assets.  Indeed, TransUnion declined to condition its bid on the assumption of two other key employment agreements: namely, those of TLO's former co-CEOs, the Asher sisters.  (PI Tr. at 107-08)  In the absence of TransUnion's affirmative decision to assume Escalante's contract, the plain language of the contract would have required that Escalante be immediately terminated upon closing of the sale, with TransUnion free to make him an employment offer.  (Udow Decl., Ex. 6, APA at §§ 4.11, 6.4)  The Court concludes that TransUnion's assumption of Mr. Escalante's contract constitutes a "hire" within the scope of the no-hire provision, and thus, facially, the restrictive covenant applies.

3.   Enforceability of the Restrictive Covenant

The parties do not dispute that the no-hire provision is a restrictive covenant. Under New York law, restrictive covenants must be "rigorously examined" and "enforced only to the extent necessary to protect the employer from unfair competition. . . ." American Institute of Chemical Engineers v. Rebel-Frier Co., 682 F.2d 382, 387 (2d Cir. 1982) (citations omitted). This strict approach is attributable to " 'the general public policy favoring robust and uninhibited competition,' and 'powerful considerations of public policy which militate against sanctioning the loss of a man's livelihood.' " Id. (quoting American Broadcasting Cos., Inc. v. Wolf, 52 N.Y. 2d 394, 404 (1981) (quotation omitted)).

New York applies a three-pronged reasonableness test in determining the validity of covenants not to compete. BDO Seidman v. Hirshberg, 93 N.Y.2d 382, 388-89 (1999). Courts applying New York law have observed that there is a dearth of case law addressing no-hire provisions, and consequently apply the same three-prong analysis applied to non-compete clauses to determine the reasonableness of no-hire provisions. See Evolution Mkts., Inc. v. Penny, No. 7823/09, 2009 N.Y. Misc LEXIS 1276, at *7-8 (Sup. Ct., Westchester Cnty. 2009) ("There appears to be no New York Court of Appeals case discussing the applicable standard for non-recruitment covenants. In fact, both parties can point to only one New York case discussing the standard."); OTG Mgmt., LLC v. Konstantinidis, 967 N.Y.S. 2d 823, 826 (Sup. Ct. 2013) (noting a lack of precedent governing no-hire provisions and applying the three-prong reasonableness test to a non-recruitment agreement). In light of this legal background, this Court applies the New York reasonableness standard to the no-hire provision at issue in this case.

"In order to be enforceable, an anticompetitive covenant ancillary to an employment agreement must be reasonable in time and area, necessary to protect the employer's

legitimate interests, not harmful to the public, and not unreasonably burdensome to the employee." Crown It Servs., Inc. v. Koval-Olsen, 782 N.Y.S.2d 708, 710 (1st Dep't 2004) (citing BDO Seidman, 93 N.Y.2d at 389 (1999)). Under New York law, determination of the enforceability of a restrictive covenant "focuses on the particular facts and circumstances giving context to the agreement." BDO Seidman at 390.

### a. Reasonableness in Geographic and Temporal Scope

The covenant does not contain any geographic limitations and, thus, is worldwide in scope. TransUnion's counsel conceded that the lack of any geographic limitation in the provision does not render it unreasonable. (TRO Tr. at 12)  Moreover, where an employer's business is conducted worldwide to a global customer base, "the lack of a geographic restriction is necessary." See Evolution Mkts., Inc. v. Penny, No. 7823/09, 2009 N.Y. Misc LEXIS 1276, at *44 (Sup. Ct., Westchester Cnty. 2009).

REI asserts that the covenant at issue is two years in length, because the TransUnion Agreement was executed on December 6, 2012 and the relevant clause ceases to apply on December 31, 2014. But, fairly construed, this covenant purports to reach further in time. By its terms, the covenant applies to all members of the "senior management team" that worked for RE LNRS during calendar year 2012—regardless of whether those individuals were still employed at the time the TransUnion Agreement was executed. The covenant therefore has the potential to apply to an individual as many as 36 months after his or her departure from RE LNRS (in the case of an individual who left on January 1, 2012), and in this case REI seeks to apply it to Escalante for a period of 31 months after his termination. As to Escalante, the covenant covers a 31-month period with an approximately 8-month gap or donut hole between

- 13 -

the date of his separation from REI in April 2012 and the December 6, 2012 signing of the TransUnion Agreement.

New York courts routinely find one-year restrictions to be reasonable, <u>Silipos, Inc. v. Bickel</u>, 06 Civ. 2205, 2006 WL 2265055, at *6 (S.D.N.Y. Aug. 8, 2006) (citing <u>Crown It Servs</u>, 782 N.Y.S.2d at 710), and have also found restrictive covenants of two years not to be "unduly burdensome," <u>see</u> <u>Chernoff Diamond & Co. v. Fitzmaurice, Inc.</u>, 651 N.Y.S.2d 504, 505 (1st Dep't 1996).  REI has relied on <u>Battenkill Veterinary Equine P.C. v. Cangelosi</u>, 768 N.Y.S.2d 504, 506 (3d Dep't 2003), which found a three-year restrictive covenant to be reasonable; the covenant in that case barred only the practice of equine veterinary medicine, and only within a 35-mile radius.  Although the opinion does not speak to the point, the severely restricted geographic scope may have saved the temporal provision in <u>Battenhill</u> from a finding of unreasonableness.  Indeed, each of the cases cited to support the finding of reasonableness included a narrow geographic limitation.  <u>Id.</u>

On the facts before this Court, a worldwide covenant extending 31 months after Escalante's cessation of employment with REI is unreasonable and, hence, unenforceable. Ordinarily, a court applying New York law would consider "blue penciling" the covenant to a less restrictive period.  <u>See</u> <u>BDO Seidman</u>, 93 N.Y.2d at 394.  Because REI has failed to demonstrate that the covenant is necessary to protect its legitimate interests, it is unnecessary to decide the outer durational limits of the restriction.

b. Enforcement is Not Necessary to Protect REI's Legitimate Interests

New York courts have recognized four legitimate interests that may be asserted to support a restrictive covenant: (1) protection of trade secrets, (2) protection of confidential customer information, (3) protection of the employer's client base, and (4) protection against irreparable harm where the employee's services are unique or extraordinary. Cenveo Corp. v. Diversapack LLC, 09 Civ. 7544 (SAS), 2009 WL 3169484, at *7 (S.D.N.Y. 2009) (citing BDO Seidman, 93 N.Y. at 388-89). REI has not asserted that the covenant is necessary to protect its confidential customer information, but has asserted legitimate interests under the other three categories recognized under New York. Each is considered in turn.

i.     Protection of the Employer's Trade Secrets

A trade secret is "any formula, pattern, device[,] or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it." Ashland Mgmt. Inc. v. Janien, 82 N.Y. 2d 395, 407 (1993) (quoting Restatement (Second) of Torts § 757, cmt. b (1979)). REI argues that the covenant must be enforced because Escalante has knowledge of certain trade secrets that, in his new position working for a TransUnion subsidiary and potentially collaborating with his former colleague Peck, could be used to the detriment of his former employer. Allegations aside, REI has not come forward with persuasive evidence that the covenant is necessary to protect a legitimate interest in any proprietary trade secret.

REI points to the company's "High Performance Computing Clustering" platform ("HPCC") as an example of such proprietary information. (Raghavan Decl. at ¶¶ 5, 7; TRO Tr. at 29-30) This platform, designed to analyze billions of records and complex data within

extremely short periods of time, was developed by REI over a ten-year period. Escalante has represented that approximately 5% of his time was spent managing the RE LNRS employees who worked on the HPCC platform. (Escalante Decl. at ¶ 7) In 2011, after an extended internal discussion that involved Peck, Escalante, and REI's CEO, Erik Engstrom, REI launched the HPCC platform as an open source offering, offering free access to the system to anyone. REI has asserted that, notwithstanding the open source nature of the platform, the company has maintained strict confidentiality with respect to certain proprietary "add-on" source code that provides REI with an ongoing competitive advantage. Id. At the evidentiary hearing, these add-ons were specifically identified as the Scalable Automated Linking Technology ("SALT"). (PI Tr. at 19)

With respect to the HPCC platform and corresponding SALT add-on technology, several circumstances undercut REI's arguments. First, Mr. Escalante has declared under penalty of perjury that he was not involved in the source code or programming of the HPCC platform. (Escalante Decl. at ¶ 7) Although Escalante may have once had access to the source code, there is no evidence that he currently possesses either the source code itself or any comparable intricate knowledge of the HPCC platform's inner workings.

Second, TransUnion has submitted several declarations indicating that neither TransUnion nor TLO has used or plans to use the HPCC platform. (Escalante Decl. at ¶ 10; Kapoor Decl. at ¶ 12; Peck Decl. at ¶ 9) TransUnion previously considered and rejected adopting the HPCC platform, instead entering into a five-year contract with an alternative platform called Ab Initio. Kapoor testified that he did not foresee TransUnion changing platforms, because the company was satisfied with Ab Initio and because TransUnion was "so far deep in execution" with the platform such that "any sort of change in direction would make it

- 16 -

very difficult for us to meet our strategic objectives or financial commitments that we have made to the board." (PI Tr. at 99)  TLO also currently employs its own proprietary data platform, "HADAR," which it plans to continue to use.  Abandoning Ab Initio and/or HADAR in favor of HPCC has not been shown to be economically or practically feasible.  The Court credits Kapoor's disclaimer of any intention to switch to HPCC.  Finally, to the extent that Escalante is in possession of any confidential information, he is forbidden from using it under the ongoing confidentiality restriction in his employment agreement with RE LNRS.

Henry Udow, the Chief Legal Officer of REI, testified that there were a number of additional "sensitive projects" that RE LNRS operated in or around Escalante's tenure.  Aside from HPCC and SALT, Mr. Udow identified several other such programs: "Accurint," a search-and-locate tool; "TRIS," or "Tax Refund Intercept Solutions", which are tax refund programs marketed to state departments of revenue; "Homestead Exemptions Solutions," a program to identify individuals seeking to claim fraudulent homestead exemptions under bankruptcy law; and motor vehicle records collections software.  (PI Tr. at 43-51).  Udow was unable to identify Escalante's role, if any, in the development of these programs.  Id.  Udow testified that the Accurint program was developed "in the early to mid-2000s," Id. at 46; Escalante was not employed by RE LNRS until November 2004.  Even if the Court were to assume that REI had legally cognizable proprietary trade secrets in the products discussed, there is simply no evidence that Escalante is in possession of these secrets.

Udow conceded that he did not believe that Escalante "was ever a coder," that he was uncertain whether Escalante had ever reviewed code, and that he had no basis to believe that Escalante took code with him when he left the company.  Id. at 75.

REI also asserts an interest in protecting proprietary information regarding its strategic plans. (Pl. Reply Mem. at 12 (Dkt No. 37))  Udow testified that, prior to his departure from the company, Peck was closely involved in the development of a three-year strategic plan for RE LNRS covering 2013 through 2015.  (PI Tr. at 6-7)  REI argues that combining this knowledge with Escalante's strategic knowledge of the company's technological strengths and weaknesses could harm REI from a competitive standpoint.  Id. at 30-31.  Under New York law, the enhanced ability to market a product without, for example, a trade secret, confidential information, or intricate knowledge of the customer base, is not a protected interest.  See Marietta Corp. v. Fairhurst, 754 N.Y.S. 2d 62, 67 (3d Dep't 2003).

Apart from allegations and argument, there was no persuasive evidence that a reunion of Peck and Escalante would have any significant impact in the marketplace.  Peck is TransUnion's CEO with far-flung responsibilities, and Escalante will be the head of business operation who reports through an intermediary to Peck.

### ii.      Protection of the Employer's Client Base

REI also claims that the covenant is necessary to protect its client base.  It argues that the reunion of Peck and Escalante at TransUnion will create an imminent threat of drawing away its customers, because the two will have significant credibility based on their past collaboration in developing the HPCC platform.  Protection of an employer's client base—i.e., its customer relationships—is a legitimate interest when "the employee must work closely with the client or customer over a long period of time, especially when his services are a significant part of the total transaction."  BDO Seidman, 93 N.Y. at 391-92 (citation omitted).

The evidence before the Court indicates that Escalante's responsibilities at RE LNRS were primarily managerial and supervisory, rather than client-focused responsibilities that have been the basis for a finding of legitimate interest under this prong. See, e.g., Silipos, Inc. v. Bickel, 2006 WL 2265055 at *5; see also PI Tr. at 75. There is no evidence that Escalante interacted with customers on a frequent basis. Escalante declares that he was never involved with selling RE LNRS services to prospective or existing customers, that he never participated in a sales call with prospective or existing customers in person or over the phone, and that he "played absolutely no role in [RE LNRS's] sales process." (Escalante Supplemental Decl. at ¶¶ 3, 4, 6)

REI has produced no evidence of client attrition under similar circumstances. Udow testified that he did not know whether TLO had won over any RE LNRS customers since Escalante joined the company in July 2013. (PI Tr. at 61) Moreover, in an internal email written prior to TransUnion's acquisition of TLO, Escalante's successor Vijay Raghavan characterized the likelihood of Escalante luring customers away to TLO as "low probability" and "unlikely." (Raghavan Decl., Ex. 2. ("I realize that it is a low probability but Armando may lure people with money to TLO. . . ."))

The Court finds that REI's claim of a legitimate interest in protecting its client base is too speculative to support the entering of a preliminary injunction. Cf. Ticor Title Ins. Co. v. Cohen, 173 F.3d 63, 72 (2d Cir. 1999) (finding a legitimate interest where a prior employee leaving a position comparable to that of the defendant took 75% of his clients with him).

iii.     Protection Where the Employee's Services are Unique or
         Extraordinary

The final protectable interest asserted by REI is that Escalante's services are unique. Under New York law, the standard for a finding of uniqueness is high: "an employee is unique if 'his services are of such character as to make his replacement impossible or that the loss of such services would cause the employer irreparable injury.' " Int'l Creative Mgmt., 2007 WL 950092 at *6 (quoting Purchasing Associates, Inc. v. Weitz, 13 N.Y.2d 267, 274 (1963)).

In general, courts applying New York law have found two sets of circumstances to constitute uniqueness. The first category applies to types of employment where the employee's services depend on the employee's special talents; examples include "musicians, professional athletes, actors, and the like." Ticor Title Ins. Co., 173 F.3d 63 at 70. The second, more recently recognized category, applies to employees who work as brokers, traders, or salespersons; courts have found such employees' services to be unique based on their unique relationships with the customers with whom they deal. Id. at 71; see also Maltby v. Harlow Meyer Savage, Inc., 166 Misc. 2d 481, 633 N.Y.S. 926 (Sup. Ct. N.Y. Cnty. 1995), aff'd, 637 N.Y.S. 110 (1st Dep't 1996); Natsource LLC v. Paribello, 151 F.Supp 2d 465, 469 (S.D.N.Y. 2001).

REI has failed to prove either set of circumstances. There was no evidence that Escalante's services to RE LNRS required special talents akin to those of "musicians, professional athletes, actors, and the like," Ticor at 70, and therefore this motion does not fall into the first category. Nor does Escalante's role fit the second category applicable to brokers and salespersons. During his approximately eight-year tenure as REI's chief technology officer for its risk solutions division, Escalante was tasked with overseeing numerous aspects of that division's work. There has been no showing that Escalante's role at REI was analogous to that

of a commodities broker or title insurance salesman.  Unlike such employees, whose primary or even exclusive role is to develop relationships and transact business with potential trading partners, Escalante's responsibilities at REI appear to have been primarily managerial and supervisory.  It is true that some individuals under Escalante's supervision were salespersons, but no significance has been demonstrated as to that circumstance.

Separately, Escalante has not been employed by REI for over one and a half years, and upon his departure he was immediately replaced by a successor, Vijay Raghavan, as chief technology officer for the company's Risk Solutions Division.  REI has failed to demonstrate that enforcement of the covenant is necessary in light of Escalante's uniqueness, because his services have already been lost and he has already been replaced.

      iv.        Risk of Employee Attrition Is Not a Legitimate Interest

REI further argues that allowing Escalante to work for TransUnion prior to the expiration of the covenant will have an adverse effect on its ability to retain its current employees.  REI asserts that the reunion of Peck and Escalante will create an imminent risk of RE LNRS employees defecting to TransUnion.  No credible evidence was presented tending to establish any real world risk of employee departures from REI to TransUnion prompted by Escalante's hiring.  REI and TransUnion have long been in complementary and competitive markets and, hence, it should come as no surprise that some employees may migrate from one to the other.  But no credible evidence supports REI's fear of loss of employees by reason of Escalante's hiring.

Moreover, protection against a general risk of possible future employee attrition is not among the four legitimate interests recognized by New York courts to justify a restrictive

covenant.  Federal courts applying New York law have consistently found this list to be an

exclusive one.  See, e.g., Locke v. Tom James Co., 11 Civ. 2961 (GBD), 2013 WL 1340841, at

*7 (S.D.N.Y. Mar. 25, 2013); Cenveo Corp. v. Diversapack LLC, 2009 WL 3169484 at *7;

Silipos, 2006 WL 2265055 at *3; Wrap-N-Pack, Inc. v. Eisenberg, 04 Civ. 4887(DRH)(JO),

2007 WL 952069, at *8 (E.D.N.Y. Mar. 29, 2007).

   REI relies on Natsource LLC v. Paribello, 151 F.Supp 2d at 469, in which Judge

Leisure found that an employer would be irreparably harmed if a departing employee, who was

covered by a restrictive covenant, were permitted to encourage other employees to leave to work

for the employer's competitors.  But the Natsource court's discussion of legitimate interests—

quite separate from its discussion of irreparable harm—recited and applied the same exclusive

list of legitimate interests set forth in BDO Seidman.  Id. at 472.  Moreover, the Natsource

court's discussion of irreparable harm regarding employee recruitment flowed directly the

departing employee's status as a broker and the unique nature of brokers' relationships with their

established customers.  Id. at 469.  The court's separate finding that the employee in question

had "unique or special abilities" was similarly based on the employee's status as a broker.  Id. at

472-74.  Thus, Natsource did not recognize a new, fifth category of legitimate interests, but

rather related to the existing categories of uniqueness and, impliedly, in protecting the

employer's client base.

   REI also cites Renaissance Nutrition v. Jarrett, No. 08 Civ. 800S, 2012 WL

42171, *4, *7 (W.D.N.Y. Jan. 9, 2012), for the proposition that there is a legitimate business

interest in preventing former employees from encouraging their former co-workers to join them

at a competitor business.  Although that case upheld a non-recruitment covenant, the court did

not recognize a new category of legitimate interest; rather, the court found that the employer had

"a legitimate interest in the protection of client relationships developed at the employer's expense." Id. at *3 (citing BDO Seidman, 93 N.Y.2d at 392). The court further noted that although the employer asserted that its "employees were not 'fungible,' seeking to enforce the covenant on the grounds that they expended resources in training and educating these employees and that replacing them would be costly and burdensome. . . under New York law these reasons do not render a non-recruitment restriction valid." Id.

Although the court in Renaissance Nutrition observed that a protection against "former employees resigning and encouraging their co-workers to join them in a competitive business" was "reasonable and legitimate," id. at *4, it is an overreading to conclude that the court intended to create or recognize an entirely new category of legitimate interest. First, the foregoing discussion demonstrates that the court recognized these interests in connection with the interest of client protection and rejected the argument that the loss of "non-fungible" employees that would be costly to replace was a legitimate interest. Second, the Renaissance Nutrition court's proposition was supported by a footnote from Kelly v. Evolution Markets, Inc., 626 F.Supp. 2d 364, 374, n. 9 (S.D.N.Y. 2009), which in turn cited Lazer Inc. v. Kesselring, 823 N.Y.S. 2d 834 (Sup. Ct. Monroe Cnty. 2005). The Lazer court analyzed the enforceability of a non-recruitment covenant and concluded that the covenant was not enforceable because the employer failed to raise an issue of fact on whether enforcement of the covenant would serve any legitimate interest. Id. at 839. Specifically, the court stated:

> It is not alleged that the employer [sic] allegedly recruited possesses any confidential or proprietary information of the plaintiff, nor is it alleged that she was in any position to acquire trade secrets. Plaintiff does not present any admissible evidence that she was a particularly valuable or unique employee, or provided services to plaintiff which cannot easily be replaced.

Id.  Thus, Lazer, and in turn Kelly and Renaissance Nutrition, are not properly read as having expanded on New York's list of legitimate interests.

In sum, because REI has failed to demonstrate that enforcement of the restriction is necessary for the protection of a legitimate interest recognized under New York law, the restriction cannot be enforced under these circumstances.


4.   REI's Additional Claims

For substantially the same reasons, REI has failed to prove that the covenant ought to be enforced on the equitable grounds of promissory estoppel.  See Am. Broad. Companies, Inc. v. Wolf, 52 N.Y.2d 394, 406 (1981) ("anticompetitive covenants covering the postemployment period will not be implied").  Nor can REI prevail on a theory of tortious interference with contract, because a valid and enforceable contract is a prerequisite to such a claim under New York law.  See Finley v. Giacobbe, 79 F.3d 1285, 1294 (2d Cir. 1996).


CONCLUSION

REI has failed to meet its burden of showing a likelihood of success on the merits. It has failed to demonstrate that enforcement of the covenant is necessary to protect a legitimate interest recognized under New York law.  REI has also failed to show serious questions as to the merits and a balance of hardships that tips decidedly in its favor.  WNET, Thirteen v. Aereo, Inc., 712 F.3d 676, 696 (2d Cir. 2013).  Specifically, REI has failed to demonstrate the likelihood of a non-speculative injury to itself and, in contrast, TransUnion has shown that if the injunction were issued, it would be left without a president and chief operating officer for its newly

acquired business.  It is not necessary for the Court to reach the issues of irreparable injury or the impact upon the public interest.

Plaintiff's motion for a preliminary injunction (Dkt. No. 11) is DENIED.


SO ORDERED.

_____
P. Kevin Castel
United States District Judge

Dated: New York, New York
        January 8, 2014